IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


J. B. TURNER                                                          PLAINTIFF

v.                              CASE NO. 2:18-CV-2171

XTO ENERGY INC.                                                      DEFENDANT

---

BRIEF IN SUPPORT OF DEFENDANT XTO ENERGY INC.'S
MOTION FOR SUMMARY JUDGMENT

I.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, J. B. Turner, Jr. (hereinafter "Mr. Turner") is a surface and mineral owner

within Section 3, Township 7 North, Range 28 West, Franklin County, Arkansas (the "Turner

Unit").  Document No. 3 (Complaint) ¶ 4, Motion Exhibit "E", p. 4). Defendant XTO Energy

Inc. ("XTO") is the operator of the Turner No. 1 Well, which is the subject of this litigation.

Around the year 1980, Arkla Exploration Company (hereinafter "Arkla"), which had

acquired oil and gas leases covering mineral interests in Section 3, proposed the drilling of the

Turner No. 1 Well.  On July 24, 1980, Mr. Turner's unleased mineral interest was integrated

pursuant to Arkansas Oil and Gas Commission Order No. 108-80 ("Order No. 108-80").  Dkt.

No. 3 (Complaint ¶¶ 6, 7 & 8 and Exhibit "A," thereto).  Pursuant to Order No. 108-80, Arkla

drilled the Turner No. 1 Well in the Turner Unit on lands owned by Mr. Turner's brother. Order

No. 108-80 covered interests from the surface to a depth of 8,800 feet. *Id*.  Mr. Turner elected to

become a non-consent owner pursuant to Order No. 108-80.[1]  *Id*.

Arkla drilled the Turner No. 1 Well deeper than originally proposed, to a depth of

---

[1] As a non-consent owner, Mr. Turner receives 1/8 of his proportionate share of production, free
of costs, until the 400% risk factor penalty is satisfied.  Should that occur, he would become a
participant in the above-8,800 feet interval for the remainder of the life of the well.

1

approximately 9,975 feet to also test formations below 8,800 feet, including the Viola Formation. Because Order No. 108-80 did not cover the deeper intervals, Arkla sought and obtained a second integration order (Order No. 2-81), and again integrated Mr. Turner's unleased mineral interest. Dkt. No. 3 (Complaint ¶¶ 9 & 10 and Exhibit "B," thereto). However, unlike his non-consent election under Order No. 108-80, Mr. Turner elected to participate under Order No. 2-81. Dkt. No. 3 (Complaint ¶ 11). Thus, Mr. Turner's interest in the Turner No. 1 Well is non-consent as to production from depths down to 8,800 feet,[2] and participating as to any production from below 8,800 feet, including the Viola Formation.

In November of 1980, the Turner No. 1 Well was dually completed in the Hale Formation between 8,566 and 8,578 feet and the deeper Viola Formation between 9,797 and 9,808 feet.  The well's downhole plumbing was arranged so that Hale Formation production was directed into the casing pipe string and Viola production was directed into the tubing pipe string. Dkt. No. 3 (Complaint ¶ 12).  Accordingly, Mr. Turner is in non-consent status as to the Hale Formation (casing), but is a participant with regard to the Viola Formation (tubing).

XTO's corporate predecessor, Arkoma Holding Corporation, acquired the original Arkla interest in the Turner No. 1 Well in September, 1999.  Motion Exhibit "G" No. 31.  The Hale Formation continuously produced gas from inception through May of 2017, when it was shut in. Motion Exhibit "I."  Total reported Hale production is 2,123,393 mcf. *Id*.  On the other hand, the Viola Formation ceased to produce gas in October of 1982, only about two years after its production began.  Its total cumulative production was only 42,793 mcf. *Id*.

In late 2016 and early 2017, following an inquiry by Mr. Turner, the Arkansas Oil & Gas Commission asked XTO to explain why the separate surface pressure gauges measuring the well's casing and tubing pipe strings had virtually identical readings.  Upon analysis, XTO

2

theorized that there was some communication between the tubing and the casing zone of the Turner No. 1 Well via a possible leak in the tubing pipe. Pursuant to the Oil & Gas Commission's rules, this theoretical potential for commingling of gas between the two pipe strings necessitated XTO's shutting in the well, as the interests in each zone are not identical. Mr. Turner then became convinced that XTO had produced gas from the Viola for which he had not been paid, and that prompted the present lawsuit.  In reality, there is a recently-developed tubing hole, at a relatively shallow depth, allowing Hale gas from the casing to enter the tubing and bring the tubing up to the same pressure as the casing.

Mr. Turner filed his complaint in Franklin County, Arkansas Circuit Court on August 28, 2018. Dkt. No. 3. The case was timely removed to this Court under its diversity of citizenship jurisdiction. Dkt. No. 1.  The gravamen of Mr. Turner's complaint is that he has been deprived of gas revenue from the production of gas out of the Viola Formation, even though the Viola Formation has been non-productive for over thirty-six (36) years. Mr. Turner's argument is based on his unsubstantiated theory that the Turner No. 1 Well has been producing gas from both formations, and that the Viola gas somehow became commingled with the gas that was produced from the Hale Zone and was reported as Hale Zone production.

## II.    SUMMARY OF MOTION

As Mr. Turner frankly admits, each count of his complaint relies on the assertion that the Viola Formation within the Turner No. 1 Well somehow sprung to life and that the Viola gas became commingled with the gas which originated within the Hale Formation.  Mr. Turner has no geological support for his speculative theory. To the contrary, all of the evidence demonstrates that the Viola Formation has not produced since the early 1980s, more than thirty-six years ago. With no proof to support his claims, the Court should dismiss his complaint.

Moreover, even if Mr. Turner's conclusion were correct, he would only be entitled to receive a proportionate co-tenant's share of whatever gas produced from the Viola Formation, and there has been no production for which he has not been paid.

In addition, Mr. Turner's complaint contains theories of liability which are legally nonexistent or inappropriate to the very facts which he alleges.

Finally, even if Mr. Turner was able to overcome these hurdles, he is still faced with the realty that most, if not all, of the relief which he seeks is barred by statutes of limitations.

## III.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be granted if there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Once a motion for summary judgment shows the absence of proof regarding any essential element of the opposing party's case, the burden shifts to the non-movant to produce "significant probative evidence." *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir. 1990).  This is evidence which would permit a finding in the non-movant's favor on more than mere speculation, conjecture, or fantasy. *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992).  The non-movant's evidence must raise more than "some metaphysical doubt" to defeat a motion for summary judgment.  *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  A plaintiff cannot create a genuine issue of fact solely by providing his own self-serving, unsubstantiated testimony in an affidavit.  *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1191 (8th Cir. 1995) (affirming summary judgment).

Here, Mr. Turner, an individual with absolutely no scientific background or education, has manufactured a theory concerning the viability of a limestone formation nearly two miles beneath the surface, which theory defies the sciences of geology and petroleum engineering.  He

4

offers no expert support for his conclusions, and, indeed, has never consulted any expert regarding them.  Rather, he has merely linked random facts, mostly taken from their context.  That cannot defeat summary judgment in this case.

### IV.    ARGUMENT

#### 1.  There is No Evidence to Support Mr. Turner's Claims

Mr. Turner has no education or experience in the sciences of geology or engineering.  Motion Exhibit "E" p. 6 ll. 2-16.  His only experience has come from sometimes participating in wells, such as the Turner No. 1 Well, drilled in units where he already owned mineral rights.  Exhibit "E", p. 60, l.13-p. 61 p. 17.  He has never employed or even consulted with a geologist or petroleum engineer on any matter, much less the scientific theories which he espouses in this case.  Exhibit "E", p. 63, l. 19-p. 64, l.

Mr. Turner has no scientific basis to support his "co-mingling" theory.  Actual co-mingling of gas between the Viola and the Hale could not have occurred because the Viola Zone is incapable of commercial gas production and has been so incapable since October, 1982, when it ceased to produce natural gas.  In his deposition, Mr. Turner candidly admitted that his entire theory fails unless the Viola Zone was capable of production at the time of the alleged commingling.  Below is an excerpt from Mr. Turner's deposition.  The excerpt begins with the deposing attorney reading to Mr. Turner from Paragraph 19 of his Complaint.  Motion Exhibit "E":

> Q. "Due to the fact that the subject well was configured to allow commingling without being granted that authority, and due to defendant's admission that it," quote, appears there may be some communication between the tubing and casing zone, close quote, "it is apparent that the subject well has produced natural gas from the tubing zone in which the plaintiff is the working interest owner."  Did I read that correctly?
> A. You did.
> **Q. Do you agree with me that that statement would only be true if the Viola formation was capable of producing?**

5

**A. Yes.**

Q. And do you understand it being XTO's position that, notwithstanding tubing leaks, notwithstanding surface plumbing, it doesn't make any difference because the Viola won't produce gas?

A. That is their position?  Is that what you're asking?

Q. Yes, sir.  Do you understand that is their position?

A. Part of their position, yes.

Q. **And so you agree with me that if they're correct about that, then the Viola has not communicated or has not commingled gas into the Hale.**

**A. If it is not capable?**

**Q. Yes.**

**A. Yes.**

Motion Exhibit "E" p. 35, l. 4-p. 36, l. 2 (emphasis added).

While Mr. Turner asserts in his answers that he has accumulated "evidence" that the Viola Formation was somehow capable of producing and commingling, even after it ceased to produce in 1982, his only asserted "evidence" is listed in his responses to XTO's Requests for Admission of Facts.  Motion Exhibit "G."  Those Requests for Admission of Facts (Motion Exhibit "G") Nos. 28-30 and Mr. Turner's responses thereto are set out below:

**Request for Admission of Fact No. 28:** According to the records of the Arkansas Oil and Gas Commission, the Viola Formation within the Turner Well has not produced since October, 1982.

**Response to Requests for Admission No. 28:** Plaintiff admits that the records of the Arkansas Oil and Gas Commission indicate that the Viola Formation within the Turner Well has not produced since October, 1982. However, well pressure tests for the Turner Well show Viola production on a much later date.

**Request for Admission of Fact No. 29:** The Plaintiff has no evidence which would disprove the information contained within the records of the Arkansas Oil and Gas Commission referred to in Requests for Admission of Fact Nos. 14-28, above.

**Response to Requests for Admission No. 29:** Denied. At some point, the Turner Well was re-plumbed to allow for the commingling of gas between the Viola and Hale zones. This ability to commingle was not known to Plaintiff nor the Arkansas Oil and Gas Commission as evidenced by the correspondence and prior shut-in of the Turner Well related to lack of commingling authority. Additionally, gas pressure tests dated May 15, 1996, May 7, 1998, and July 18,

1997, indicate that the Turner 1 well was producing through the tubing which indicates that the Viola formation has been commercially productive contrary to Defendant's position.

**Request for Admission of Fact No. 30:** The Viola Formation within the Turner well is incapable of producing gas in commercial quantities.

**Response to Requests for Admission No. 30:** Denied. At some point, the Turner Well was re-plumbed or initially configured to allow for the commingling of gas between the Viola and Hale zones. This ability to commingle was not known to Plaintiff nor the Arkansas Oil and Gas Commission as evidenced by the correspondence and prior shut-in of the Turner Well related to lack of commingling authority. Plaintiff believes the Viola zone to be capable of producing gas in commercial quantities. Plaintiff's belief is based upon the AOGC records indicating a rise in production in the Hale zone that Plaintiff believes is attributable to commingling of Viola gas, the pumper records, and other productive wells in the Viola zone being the Holland 1-3 and Robinson 1 well. Additionally, gas pressure tests dated May 15, 1996, May 7, 1998, and July 18, 1997, indicate that the Turner 1 well was producing through the tubing which indicates that the Viola formation has been commercially productive contrary to Defendant's position.

These discovery responses show that Mr. Turner relies solely upon unidentified pumper records,[3] an increase in the well's Hale Zone production which occurred in 1999, unspecified information from two other wells, the Holland No. 1-3 Well and the Robinson No. 1 Well, and three Arkansas Oil and Gas Commission pressure test reports which are reproduced immediately below and labeled Figures 1-3.

The pressure test reports referred to above are Exhibits "3", "4" and "5" to Mr. Turner's Deposition.  Motion Exhibit "E."  In each of the three, the well name is "Turner 1-C" signifying the casing (Hale) Zone[4], the tested reservoir is listed as "Hale, " and the Producing Section is listed as "8586-7575," which corresponds to the completed interval in the Hale Zone.  **In other words, these are Hale Zone pressure tests, mislabeled on one blank in the form which was submitted to the Oil and Gas Commission.**

---

[3] No such pumper records were identified in his discovery responses or his deposition.
[4] The Viola Zone is named Turner No. 1-T (tubing) within Commission records.

7

As he clearly explains in his affidavit (Motion Exhibit "H"), Mr. Bobby Morris, the technician who conducted those annual pressure tests, entered information concerning those tests, as well as tests conducted on other wells within his area, in his handwriting on spreadsheets. Copies of those spreadsheets are attached to Mr. Morris' affidavit as Exhibit "B", thereto. They clearly indicate that the Hale Zone (casing) was the only zone tested and that the Viola Zone was not producing but was shut-in ("S.I."). Those handwritten spreadsheets were then faxed to his employer, Seagull's, office in Shreveport, Louisiana, where their information was entered onto official Arkansas Oil and Gas Commission Forms by other Seagull employees. It was at that point that the employee or employees who filled out the Commission forms incorrectly inserted the word "tubing" instead of "casing" in the blank after the category "PRODUCING THROUGH." That was a simple error, nothing more, as Mr. Morris has stated in his affidavit. *Id.* Importantly, Mr. Turner admitted in his deposition testimony that he could not disprove Mr. Morris' anticipated testimony on this issue.

> Q.  And who is the Seagull Mid-South employee who
>        conducted the test?
> A.   Bobby Morris.
> Q.   If Mr. Morris's testimony, either in an affidavit or at trial, was that he wrote
> the word "tubing" on this test by mistake and that it was, in fact, a test of the
> casing, would you have any way to dispute that?
> A.   Not at the present time.

Motion Exhibit "E" (Turner Deposition) p. 27, ll. 18-25.

Also reproduced below, as Figure 4, is a report for a fourth test, filed with the Commission on July 2, 1999. It is apparent that the same mistake was made on that test report. However, when it was filed with the Commission, a Commission employee made a handwritten correction of the error striking out "tubing" and handwriting "csg" so that

8

the test report on file with the Commission is correct.  Not surprisingly, Mr. Turner did

not choose to cite the Figure 4 test report as part of his "proof" that the Viola formation

was capable of production.

In sum, as clearly testified to by Mr. Morris, Mr. Turner's reliance on these

pressure test reports is entirely misplaced and they in fact prove that there was no

production from the Viola during these years.

**Figure 1**

**Figure 2**

9

**Figure 3**

**Figure 4**

Mr. Turner also cites a "rise in production in the Hale Zone which the Plaintiff believes is attributable to the commingling of Viola gas."  In October 1999, shortly after XTO's corporate predecessor acquired the operator's interest in the Turner No. 1 Well, Hale production did briefly increase.  No one can explain, today, why that production increase occurred.  It is an event which happened almost twenty years ago, to a flow of gas originating more than a mile beneath the surface.  Regardless, we do know that the flow increase was not caused by any sudden resurgence of the Viola Formation.  The Affidavit of Mr. Tim Isernhagen (Motion Exhibit "C"), a highly qualified and experienced expert in the field of reservoir engineering, explains that the shut-in pressure within the Viola Zone of the well was far lower than the pressure in the pipeline carrying gas from the well to market.  Gas cannot flow against higher pressure.  So, even if the Turner No. 1 Well's Viola Formation had not been under water at the time, its contents could have never moved into the pipeline.

10

As Mr. Isernhagen states, an unanticipated increase or decrease in production can have multiple causes, many of which cannot be positively proven. Several such possible causes are listed in his affidavit. Importantly, however, the Viola Formation which, at the time was both under water and lacking the pressure to produce was not among those possible causes.

Mr. Isernhagen's Affidavit, and that of Ms. Shana Wells (Exhibit "B"), herself an expert in petroleum geology, explain why the Viola Formation stopped producing in October, 1982 and has been incapable of production ever since. It, along with the two wells in the vicinity which are close to the same structural level as the Turner No. 1 Well, "watered out." Their Viola intervals were flooded by underground salt water, the weight of which produced hydrostatic pressure too great for the formations' limited pressures to overcome. Water seeks its own level, of course. Exhibit "D" to Ms. Wells' affidavit is a cross section of the well logs of the relevant wells in the vicinity, including those mistakenly relied upon by Mr. Turner, with a plot showing water encroachment, over time. Ms. Wells' affidavit also clearly shows that data from the Holland No. 1-C and Robinson No. 1 Wells give no support to Mr. Turner's theory. Rather, data from those wells add additional proof that Mr. Turner's theory is incorrect.

The Viola Zone in the Robinson No. 1 well, which is slightly higher, structurally, than the Turner No. 1 Well, watered out in 1985, after producing only 118 mcf. The Holland No. 1-3 Well is the only nearby well which has not been shown to have watered out at the Viola Formation level. This is simply because the Viola interval within the Holland No. 1-C Well is over 520 feet higher than the Viola interval in the Turner No. 1 Well. The water has not arrived there yet. Additionally, in the Holland No. 1-C Well, the Viola formation is commingled, as permitted by an Oil and Gas Commission order, with two shallower formations. Motion Exhibit "F." Ms. Wells states that the majority of the production from the Holland No. 1-C well is from

11

the Hale Formation.  When questioned about contribution of the Viola to the Holland No. 1-C in his deposition, Mr. Turner revealed that he had no idea that the Holland No. 1-C well, which he cites as a component of his "evidence," was actually producing from three commingled formations.  He instead assumed that its entire production was from the Viola Formation. Motion Exhibit "E," p. 47, l., 17-p. 49, l. 9.

Simply stated, Mr. Turner's case fails because, as shown by Mr. Isernhagen's and Ms. Well's affidavits and supporting documentation attached thereto, the Viola Formation ceased to be capable of production in the Turner No. 1 Well over 36 years ago. Mr. Turner admits this fact is fatal to his entire claim.  For this reason alone, XTO is entitled to summary judgment dismissing Mr. Turner's entire complaint, with prejudice.

**2.    Count I: Breach of Contract.**

Numerous hurdles exist to Mr. Turner's breach of contract theory. First, he must supply proof of the existence of a contract with XTO.  While Mr. Turner alleges that he "has a direct contractual relationship with the Defendant by virtue of being a working interest owner subject to the joint operating agreement for the subject well and section" (Dkt. No. 3 (Complaint, Count I)), he has never signed the joint operating agreement he mentions.  Motion Exhibit "A" (affidavit of Teresa Grant).  In his deposition, Mr. Turner, through his counsel, agreed to produce an agreement containing his signature if one existed.  Motion Exhibit "E" (Turner Deposition) p. 36, l. 3 – p. 38, l. 11.  No such agreement has ever been produced.

Absent a written contract, Mr. Turner would only be entitled to a share of Viola production from the Turner No. 1 Well (if there even was any such Viola production) because of his election to participate, made pursuant to Order No. 2-81.  Motion Exhibit "E" (Turner Deposition) Exhibit "B."  The effect of that order and Mr. Turner's election to participate in the

12

covered interval was to create an *implied* contractual relationship between Mr. Turner and the remaining participants in the well.  Although Mr. Turner could have created an express written contractual relationship by executing a JOA, he apparently failed to do so.

The importance of this discussion, as further discussed in Section IV (7.) *infra*, is that there is a significant difference between periods of limitations between an alleged breach of a written or an implied contract.  Because there is no proof of a written agreement between the parties, XTO is entitled to summary judgment that any contractual relationship between it and Mr. Turner relating to the Turner No. 1 Well is implied, rather than express.

> **3.    Count II: Conversion.**

The arguments within Section IV(2) above are applicable to Mr. Turner's conversion claim as well.   If, as mistakenly claimed by Mr. Turner, the Viola Formation has or could produce gas, his property interest would only afford him the right to take his co-tenant's share of that production from the well.

Whether under the JOA or pursuant to Arkansas Oil and Gas Commission Order No. 2-18, co-owners of production from a natural gas well are co-tenants under Arkansas law.  Co-tenants are each entitled to take production from the well and taking more than one's share is not tortious. *See* Susan Weber Wright, ARKANSAS LAW OF OIL AND GAS, 9 U.A.L.R. L.J.223 at 241-3, and authorities cited therein including, particularly, *Fife v. Thompson*, 288 Ark. 620 (1986).  The tort of conversion requires proof that the "the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of, or is inconsistent with, the owner's rights." *Integrated Direct Mktg., LLC v. Drew May &Merkle, Inc.*, 2016 Ark. 281, 3 (2016).  Even a mere debt obligation sounding in contract does not constitute conversion. *Smith v. SWN Prod. (Ark.), LLC, et al.,* 2017 WL 4570320, *13 (E.D. Ark. March 21, 2017).  Differing

interpretations of contractual duty cannot give rise to a distinct tort claim. *Adkins v. Hoskins*, 3 S.W.2d 322, 326 (Ark. 1928).

Even if Mr. Turner could somehow meet his burden and show that the Viola Zone produced gas within the applicable limitations period, which it did not, there is no conversion because XTO and Mr. Turner enjoy a co-tenancy relationship. XTO has the undisputed right to produce the gas. Mr. Turner is simply entitled to take his share of that gas, as gas, if enough gas remains in the ground so that he may recover his share. He would be entitled to an accounting and recovery from the remaining owners if the reserves in the ground are insufficient for that recovery, which he has not alleged. Because the facts do not support a cause of action for conversion, XTO is entitled to summary judgment dismissing Mr. Turner's conversion count.

4.      **Count III:  Violation of Arkansas Code Annotated §§15-74-601 through 604.**

Count III of the Complaint must be dismissed because Mr. Turner has not pled or supplied any facts to support a claim under Ark. Code Ann. §§15-74-601 through 604. Ark. Code Ann. § 15-74-601 only provides a remedy to persons that are entitled to "proceeds from the sale" of oil and gas production. Even if Mr. Turner was a party to the Unit JOA that he never executed, he is still not automatically entitled to "proceeds from sale." Rather, Mr. Turner would only be entitled to take his share of the Viola formation gas in kind. Motion Exhibit "E" (Turner Deposition) Exhibit 6, p.6, l. 64 *et seq*. In other words, even if Mr. Turner could overcome the fact that the Viola formation is not productive, then at most, he is a co-tenant, along with XTO and the other JOA signatory parties, in the well. As a co-tenant, Mr. Turner would be entitled to take gas along with the other parties, not a share of other tenants' "proceeds from the sale".[5]

While Ark. Code Ann. § 15-72-604 provides a mechanism for an owner of less than 5%

---

[5] XTO and other participating parties would own more than 95% of production from this watered-out Viola Zone, had it really produced.

of a well to compel the operator to sell his share of such in-kind production, Mr. Turner has not satisfied the prerequisites contained within that section.  The statutes referenced in Count III of Mr. Turner's complaint are simply inapplicable under the undisputed material facts.  Therefore, Count III should be dismissed.

5.      **Count IV:  Violation of the Prudent Operator Standard Arkansas Code § 15-73-207.**

Count IV of the Complaint alleges that XTO violated the prudent operator standard. While Arkansas law requires lessees to develop and operate a leased mineral estate in good faith as a prudent operator, the statute creates no independent cause of action. It is merely an oil-and-gas specific version of the duty of good faith and fair dealing inherent in all contracts. See *Wallace v. XTO Energy, Inc., et al.*, 2014 WL 4202536, *4 (E.D. Ark. Aug. 22, 2014); *Collins v. SEECO, Inc.*, 2012 WL 2309080, *1-2 (E.D. Ark. June 18, 2012).

Since there is no recognized cause of action for any alleged breach of the prudent operator standard, as set forth in Ark. Code Ann. 15-73-207,  XTO is entitled to summary judgment dismissing Count IV of Mr. Turner's Complaint.

6.      **Count V: Violation of the Arkansas Deceptive Trade Practices Act (Arkansas Code § 4-88-101 *et seq*.)**

The Deceptive Trade Practices Act is inapplicable to the facts alleged by Mr. Turner.  *See Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015), citing several reported Arkansas decisions holding that "[t]he elements of ... a cause of action [under that statute as defined by § 4–88–107(a)(10) ] are (1) a deceptive *consumer-oriented* act or practice which is misleading in a material respect, and (2) injury resulting from such act.  *Skalla v. Canepari,* 2013 Ark. 415, 14(Ark.). (emphasis in original)

The Arkansas Deceptive Trade Practices Act is designed to protect consumers from

15

deceptive corporate activities that affect the public at large.  Mr. Turner's complaint alleges that XTO failed to account to him for gas allegedly commingled from the Viola Formation into Hale gas production and that XTO concealed such commingling by failing to tell him and the Arkansas Oil and Gas Commission that it had done so.  Absent from the complaint is the allegation of any "consumer-oriented act or practice."  This is because Mr. Turner is not a consumer in this context.  He is a single working interest owner who participated with his interest in one geological interval within a natural gas well.  His circumstances (being in non-consent status in the completed and productive Hale Formation and participating in the completed, but nonproductive Viola Formation is unique, but it is not a "consumer-oriented" practice. Moreover, the public at large—those persons designed to be protected under the Act—are not involved in this case.  The Arkansas Oil and Gas Commission, being a state regulatory agency, is certainly not the public. *See also Apprentice Information Systems, Inc. v. DataScout, LLC*, 2018 Ark. 149,5-6 (Ark.); *Forever Green Athletic Fields, Inc. v. Lasiter Constr., Inc.*, 384 S.W.3d 540, 552 (Ark.App. 2011); *Wallis v. Ford Motor Co.,* 208 S.W.3d 153, 161 (Ark. 2005).

Since Mr. Turner's alleged injury is not related to a consumer-oriented act or practice, there are no facts to support any claim under the Deceptive Practices Act.  Therefore, Count V of the Complaint must also be dismissed.

**7.     Mr. Turner's Claims are Barred, in Whole or in Part, by Limitations.**

Even if the Court found that genuine disputed material facts existed as to the pled causes of action, most, if not all, of the time period over which he claims damage is barred by limitations.  Mr. Turner claims to be entitled to damages from 1999, if not even earlier.  Arkansas' limitations period for breach of an express written contract is five years (Ark. Code Ann. § 16-56-111).  Likewise the statutory limitations period for breach of the Deceptive Trade

Practices Act is five years (Ark. Code Ann. §4-88-105).  The limitations periods applicable to the remaining claims is three years (Ark. Code Ann. § 16-56-115).

Mr. Turner's complaint alleges what the Arkansas Supreme Court has termed a "recurring or continuing injury," meaning that the applicable statutes of limitation create a rolling window of applicable years ending on the date suit was filed.  *Atlanta Exploration, Inc. v. Ethyl Corp.*, 784 S.W.2d 150, 154 (Ark. 1990) citing *Arkebauer v. Falcon Zink Co.,* 12 S.W.2d 916, 919 (1929).  Mr. Turner filed his complaint on August 28, 2018.  Thus, any three-year limitations window began August 29, 2015 and, if any five-year windows are applicable, they began on August 29, 2013.  While, as repeatedly stated above, Mr. Turner cannot present any issue of material fact that the Viola Formation produced since 1982, he similarly cannot show that it produced within the applicable limitations periods.

Mr. Turner may claim that he was unaware of his cause of action until recently. However, Arkansas clearly applies the occurrence rule, rather than the discovery rule when applying statutes of limitations.  Mere ignorance of one's rights does not prevent the operation of the statute of limitations. That court in *Atlanta Exploration, Inc. v. Ethyl Corp.*, *supra*, stated the point succinctly, citing both *Williams v. Purdy*, 223 Ark. 275 (1954) and *McKneely v. Terry*, 61 Ark. 527 (1896):

> The court in *Williams*, quoting from *McKneely v. Terry*, 61 Ark. 527, 33 S.W. 953 (1896), the following rule with approval:
>
>> No mere ignorance on the part of plaintiff of his rights, nor the mere silence of one who is under no obligation to speak, will prevent the statute bar. There must be some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed, or perpetrated in a way that it conceals itself. And if the plaintiff, by reasonable diligence, might have detected the fraud, he is presumed to have had reasonable knowledge of it.

*Atlanta Exploration v. Ethyl Corp.*, *supra*, 331 Ark. at 340.  Like this case, *Atlanta* involved the

alleged non-payment or misappropriation of underground minerals.  In an even more recent case,

also involving similar issues, the Eighth Circuit Court of Appeals applied the same analysis,

affirming a decision of Hon. Harry Barnes of the El Dorado Division of this Court in *Deltic*

*Farm and Timber Co., Inc. v. Great Lakes Chemical Corp.*, 120 F.3d 854 (8th Cir. 1997):

> The only issue in this appeal is whether, under the relevant Arkansas law,
> the statute of limitations in this case did not begin to run until after Deltic
> discovered that Great Lakes was removing bromine-rich brine from its property.
> Deltic points out that this "discovery rule," as it is called, is the law in several
> states, and it argues that the Arkansas Supreme Court, if given the chance, would
> hold that the rule is the law in Arkansas as well. We cannot agree. The Arkansas
> court had the chance in a recent mineral rights case to embrace this rule if it had
> believed it applied, but instead it voiced what appears to us to be a conviction that
> the rule is not part of the law of Arkansas. At*lanta Exploration, Inc. v. Ethyl*
> *Corp.*, 301 Ark. 331, 340–41, 784 S.W.2d 150, 154 (1990).

> The court, quoting a trespass case that has been relied on repeatedly by
> the Arkansas courts for more than a hundred years, held that " '[n]o mere
> ignorance on the part of plaintiff of his rights, nor the mere silence of one who is
> under no obligation to speak, will prevent the statute [of limitations] bar. There
> must be some positive act of fraud, something so furtively planned and secretly
> executed as to keep the plaintiff's cause of action concealed, or perpetrated in a
> way that it conceals itself.' " *Id*., quoting *McKneely v. Terry*, 61 Ark. 527, 545, 33
> S.W. 953, 957 (1896). There is no dispute in the present case that Great Lakes
> committed no positive act of fraud. When Deltic acted to oppose the application
> to the Commission, it was able to support its argument with information that was
> in the public domain. Lacking any evidence of fraudulent concealment on Great
> Lakes's part, Deltic cannot withstand this summary judgment motion.

120 F3d at 855-6.

Mr. Turner's entire "evidence" discussed in Section IV (1.) above is within the public

domain. Every test, every conducted operation involving the Turner No. 1 Well is documented in

detail within the publicly available files of the Arkansas Oil and Gas Commission.  For example,

Mr. Turner relies upon backpressure tests conducted on the producing Hale Zone within the well

which he mistakenly asserts involved the Viola Zone.  (See Motion Exhibit "M," Affidavit of

18

Bobby Morris). Moreover, the 1999 spike in the well's Hale Zone production was reflected on the very royalty checks which Mr. Turner received for his royalty interest in the well.

## V. CONCLUSION

For these reasons, the Court should grant summary judgment for XTO on all of Plaintiff's claims and dismiss this action with prejudice. Alternatively, should the Court conclude that some unresolved material issues of fact remain which precludes complete summary judgment, the Court should grant each of the requests for partial summary judgment discussed in IV (2) through IV (7) above.

Respectfully submitted,

/s/ Thomas A. Daily_____
C. Michael Daily
Arkansas Bar No. 2005223
Thomas A. Daily
Arkansas Bar No. 70019

DAILY & WOODS, PLLC
58 South 6th Street
Fort Smith, AR 72901
Tel: (479) 782-0361
Fax: (479)782-6160
mdaily@dailywoods.com
tdaily@dailywoods.com

*Counsel for Defendant XTO Energy Inc.*

## CERTIFICATE OF SERVICE

This certifies that I, Thomas A. Daily, have served a copy of the foregoing upon all parties of record except those whom I represent by depositing a true and correct copy of the same in the United States mail at Fort Smith, Arkansas, in a properly addressed envelope with the necessary postage affixed hereto, on this 11th day of June, 2019, addressed to the following:

Erik P. Danielson
Kyle Lippard
DANIELSON LAW FIRM, PLLC
909 Rolling Hills Dr.
Fayetteville, AR  72703

/s/ Thomas A. Daily_____
Thomas A. Daily

20