UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

J.B. TURNER                                                                                   PLAINTIFF

v.                                         No. 2:18-CV-02171

XTO ENERGY INC.                                                                       DEFENDANT

## OPINION AND ORDER

Before the Court is Defendant XTO Energy Inc. ("XTO")'s motion (Doc. 11) for summary judgment, brief in support (Doc. 12), and statement of facts (Doc. 13). Plaintiff J.B. Turner filed a response in opposition (Doc. 16) and a statement of facts (Doc. 15). XTO filed a reply (Doc. 17) to Turner's response. For the following reasons, XTO's motion for summary judgment will be GRANTED.

**I.     Background**

Plaintiff J.B. Turner is the owner of surface and mineral interests located in Section 3, Township 7 North, Range 28 West in Franklin County, Arkansas. In 1980, Arkla Exploration Company ("Arkla") acquired oil and gas leases covering a unit[1] of mineral interests in Section 3. Arkla proposed the drilling of the "Turner No. 1 Well" to the Arkansas Oil and Gas Commission ("AOGC"). Pursuant to Order No. 109-80, AOGC permitted Arkla to drill a well to a depth of 8,800 feet on the unit. Order No. 109-80 integrated[2] Mr. Turner's mineral interests in a 640-acre drilling unit. Arkla intended to use this well to extract gas located in the Hale Formation, a

---

[1] A drilling "unit" is a set amount of acres designated by the AOGC that will be impacted by the drilling of a well, to ensure that all mineral owners potentially impacted by the producing well will receive proper compensation.

[2] When a mineral owner does not enter into a mineral lease with a company wanting to drill and produce gas, an Arkansas statute provides for integration of the unleased mineral interest to allow the well to be drilled to recover the gas production. An integration order sets forth how the mineral owner will receive his share of the proceeds from the gas produced from the well.

1

geological formation lying at a depth between 8,566 feet and 8,578 feet. As shown in Order No. 109-80, Mr. Turner elected to become a non-consenting working interest owner and was subject to a 400% risk factor penalty. Arkla drilled the Turner No. 1 Well to a deeper depth of 9,975 feet to test lower formations, including the Viola Formation, which lies between 8,808 feet and 9,797 feet. The Turner No. 1 Well was drilled as a dual completion well plumbed into two concentric zones—a casing zone and a tubing zone. The tubing zone comprises a smaller pipe located within the larger pipe that is the casing zone. The Hale Formation produces into the casing, and the Viola Formation produces into the tubing, which are separate sources of supply metered separately at the wellhead.

Following the test bore into the Viola Formation, Arkla applied for integration of the 640-acre unit for depths down to 9,975 feet. On January 28, 1981, Mr. Turner's mineral interest from 8,800 feet to 9,975 feet was integrated pursuant to AOGC Order No. 2-81 for gas produced from the Viola Formation. Under Order No. 2-81, Mr. Turner elected to participate as a working interest owner and pay his share of the drilling and completion costs. Mr. Turner's participating working interest in this unit was four percent. As to the Viola Formation, this meant that Mr. Turner would receive four percent of the gas from the well or he could contract with the operator to sell his share and receive the proceeds from the sale of gas. Mr. Turner never executed an operating agreement or other written contract with Arkla or any of the succeeding operators of the Turner No. 1 Well.

The Turner No. 1 Well produced 42,793 MCF of gas from the Viola Formation between 1981 and November of 1982. In 1982, Arkla determined that the Viola Formation in Turner No. 1 was no longer producing because the Viola Formation "watered out."[3] XTO presents evidence

---

[3] A well "waters out" when the water in the formation overcomes the pressure of the gas and prevents the production of gas from the well.

that three wells located within a two-mile radius of the Turner No. 1 Well that were productive from the Viola Formation also watered out and were no longer productive. XTO provides affidavits from its geologist and its reservoir engineer demonstrating that based on pressure tests, fluid levels, shut-in tests, records of well work, and other correspondence regarding wells in the area, the Viola Formation in Turner No. 1 Well was incapable of commercial production since the early 1980s.

For some time in the 1990s, Seagull Energy E & P, Inc. operated the Turner No. 1 Well and Bobby Morris was a production foreman tasked with accompanying an AOGC employee to run pressure test on active wells for AOGC records. Mr. Morris's test forms for the Turner No. 1 Well from 1996, 1997, and 1998 all reflect that the tubing zone was being tested and was capable of producing gas. However, Morris provides an affidavit stating that he was not testing the tubing zone but rather the casing zone on Turner No. 1 Well when the data on the 1996, 1997 and 1998 forms was recorded. Mr. Morris's statement is reinforced by each form correctly identifying that the test was from the producing section of "8586-7575" and listing the well as Turner 1-C, indicating that the casing zone was being tested. Morris believes that the forms reflect tests from the tubing zone instead of the casing zone because of a clerical error that occurred when he sent the data to be formally recorded at Seagull Energy's headquarters.

In September of 1999, XTO's corporate predecessor Cross Timbers Oil Company assumed operations of the Turner No. 1 Well. In October of 1999, AOGC records reflect a spike in gas production for the Turner No. 1 Well. XTO is unable to confirm a specific cause for the increase in production from the well. Mr. Turner was aware of this increase in production because he

received an increase in royalty payments as a result of the increased production.[4] Turner now believes that this spike in production in 1999 was a result of the Viola Formation producing gas. However, XTO's reservoir engineer states that the additional gas could not have come from the tubing zone because the pressure tests around that period reveal that the tubing pipe pressure was 200 psi less than the pressure in the casing pipe and in the pipeline and it is impossible for gas to flow from a point of lower pressure to a point of higher pressure without a compressor.

Beginning in 2001, operator records reflect equalized pressure records in the tubing and casing zones. XTO's reservoir engineer believes that this equalization in pressure resulted from a hole forming in the tubing pipe. Turner contends that this equalization is a result of intentional commingling of the casing and tubing zones.

In December of 2016, Mr. Turner filed an inquiry with the AOGC alleging that equal pressure between the casing and tubing zones demonstrated that the zones were "communicating," or commingling gas supply, in violation of the AOGC Authority to Communicate rule for dual completion wells.[5] Turner submitted a photograph of the gauges at the wellhead. In response, XTO agreed that there was apparent communication between the tubing and casing zones and agreed to shut in the well until the commingling issue was resolved. On August 8, 2018, Mr. Turner filed this lawsuit against XTO seeking damages for breach of contract, conversion, statutory oil and gas violations, and for violating the Arkansas Deceptive Trade Practices act from

---

[4] Since Mr. Turner owns 100% of the minerals, he was entitled to a royalty attributable to his ownership interest even though he was a non-consenting working interest owner in the Hale Formation and a participating working interest owner in the Viola Formation.

[5] Plaintiff speculates that the Turner Well was replumbed at some point in time to allow for the commingling of gas between the tubing and casing zones and alleges that XTO Energy was aware of the replumbing and concealed it from AOGC and Mr. Turner.

September 1999 until today because XTO failed to pay him his share of proceeds he believes XTO collected for gas production from the Viola Formation.

## II. Legal Standard

When a party moves for summary judgment, it must establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). In order for there to be a genuine issue of material fact, the nonmoving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66–67 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Only facts "that might affect the outcome of the suit under the governing law" need be considered. *Anderson*, 477 U.S. at 248. "[T]he non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof." *P.H. v. Sch. Dist. of Kan. City, Mo.*, 265 F.3d 653, 658 (8th Cir. 2001) (quotation omitted). Facts asserted by the nonmoving party "must be properly supported by the record," in which case those "facts and the inferences to be drawn from them [are viewed] in the light most favorable to the nonmoving party." *Id.* at 656–57.

## III. Analysis

### A. Statute of Limitations

#### 1. Breach of Contract

As an initial matter, XTO argues that Mr. Turner's claims are barred, in whole or in part by the statute of limitations. Because this is a diversity case, the Court applies Arkansas substantive law. *Murray v. Greenwich Ins. Co.*, 533 F.3d 644, 648 (8th Cir. 2008) (citing *Erie*

*R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). Arkansas breach of contract claims based on an implied contract theory are subject to a three-year statute of limitations. Ark. Code Ann. § 16-56-105 (West 2019). A contract claim in the State of Arkansas "does not begin to run until the plaintiff has a complete and present cause of action." *Smith v. Eisen*, 245 S.W.3d 160, 140 (Ark. Ct. App. 2006). "For breach of contract, the true test in determining when a cause of action arises or accrues is to establish the time when the plaintiff could have first maintained the action to a successful conclusion." *Id.*

"[M]ere ignorance of one's rights does not prevent the operation of the statute of limitations, but where the ignorance is produced by affirmative and fraudulent acts of concealment, the statute of limitations does not begin to run until the fraud is discovered." *Atlanta Exploration, Inc. v. Ethyl Corp.*, 784 S.W.2d 150, 154 (Ark. 1990). "If the Plaintiff by reasonable diligence, might have detected the fraud, he is presumed to have had the reasonable knowledge of it." *Id.*

Mr. Turner seeks damages for XTO's breach of its agreement as operator of the drilling unit established in AOGC Order No. 2-81, covering the Viola Formation, from September of 1999 until the present time. Mr. Turner alleges that XTO breached the implied contract it shared with him by failing to properly account for and pay over the proceeds of the gas produced from the Viola Formation of the Turner No. 1 Well beginning in September of 1999. Mr. Turner could have first maintained his action to a successful conclusion at that time, provided he could support his allegations with the necessary evidence. Thus, his action began to accrue in September of 1999. An implied contract has a three-year statute of limitations period. Mr. Turner would have had to file his breach of contract claim by September of 2002 for the action to be timely. As a result, Mr. Turner's breach of contract claim is barred by the statute of limitations unless he can

prove that his failure to file his contract action within the statute of limitations was a result of affirmative and fraudulent acts.

Mr. Turner fails to cite any evidence in the record necessary to make this showing. Mr. Turner speculates that the Turner No. 1 Well was replumbed at some point to commingle gas produced from the Hale and Viola formations and that XTO concealed these acts from him. However, it is clear from his response to XTO's motion for summary judgment that Mr. Turner had access to the land to view the measurement gauges, had access to the public AOGC records reflecting the changes in pressure for the casing and the tubing in 2001, and even received an increase in royalty payments when the well production increased in 1999. Reasonable diligence would have discovered the possibility of commingling of gas at that time. Mr. Turner's failure to inquire into the matter until long after his claim had expired does not save him from the presumption that he had reasonable knowledge of the accrual of the cause of action.

Furthermore, Mr. Turner has not shown a genuine issue of material fact regarding whether XTO engaged in affirmative and fraudulent conduct. XTO provides two experts that conclude that the Viola Formation watered out in the early 1980s and that any commingling of zones likely resulted from a failure in the tubing pipe causing any gas from the Viola Formation to migrate into the casing pipe. Mr. Turner speculates that the well was replumbed and that the valve allowing the commingling of gas at the wellhead had been opened before. However, Turner does not provide evidence to challenge the opinions of XTO's geologist and reservoir engineer regarding the viability of commercial production from the Viola Formation, nor does he provide evidence that the equalization of pressures between the tubing and casing zones resulted from anything other than a hole that opened in the tubing zone pipe. Further, Turner provides no evidence to support his speculation that the well was "replumbed" at the wellhead or that the valve was opened to allow

commingling between the tubing and casing pipes. Mr. Turner disbelieves XTO's opinion evidence, but he provides no opposing factual or opinion evidence to create a genuine dispute of material fact about whether those opinions are true. Therefore, Mr. Turner cannot show any fraudulent concealment, and his action for breach of contract is barred by the statute of limitations.

### 2. Conversion

Like his breach of contract claim, Mr. Turner's conversion claim has a three-year statute of limitations. Ark. Code Ann. § 16-56-105. Even where a plaintiff alleges a continuing injury, Arkansas courts do not toll the statute of limitations, but instead the limitations period begins to run when the wrongful acts first occurred. *Chalmers v. Toyota Motor Sales, USA, Inc.*, 935 S.W.2d 258, 264 (Ark. 1996). Again, fraudulent concealment "suspends the running of the statute of limitations until the party . . . discovers the fraud or should have discovered it by reasonable diligence." *Bragg v. Morgan*, No. CA 99-1135, 2000 WL 1456929, at * 2 (Ark. Ct. App. 2000).

Mr. Turner alleges that he is owed damages from September of 1999 until the present time because XTO converted working interest payments owed to him from Viola Formation production. Because Arkansas law does recognize the continuing tort theory for limitations purposes, Mr. Turner had three years from September of 1999 to bring his claim for conversion of payments owed to him from Viola Formation production. Mr. Turner did not file his claim for conversion until August 8, 2018, and as a result his claim is untimely, unless he can demonstrate that the statute of limitations should be tolled because of fraud.

As set forth in the Court's analysis of Mr. Turner's breach of contract claim, Mr. Turner has not provided any evidence that XTO engaged in affirmative or fraudulent conduct to conceal the alleged conversion of gas proceeds from the Hale and Viola Formations. Mr. Turner's claim for conversion is time barred.

### B. Ark. Code Ann. § 15-74-601 – 604

Mr. Turner also alleges that XTO's failure to pay him from the proceeds of the gas produced from the Viola formation is a violation of Arkansas Code Annotated § 15-74-601-604. First, Mr. Turner has not raised a genuine issue of material fact regarding whether the Viola Formation is capable of commercial production. Second, Mr. Turner has provided no evidence that he was entitled to proceeds from the sale of gas from XTO. Although XTO did enter into a joint operating agreement with the participating working interest owners in the 640-acre unit, there is no evidence that Mr. Turner entered into that operating agreement. As a result, Mr. Turner can show only that he was entitled to his four percent share of the gas produced from the Viola Formation, rather than proceeds generated from the sale of the gas.

### C. Violation of the Prudent Operator Standard (Ark. Code Ann. § 15-73-207)

Turner alleges that XTO violated the prudent operator standard articulated in Arkansas Code Annotated § 15-73-207. This provision does not create a separate cause of action. Rather, the prudent operator standard is an oil and gas specific version of the duty of good faith and fair dealing in a contract. *Wallace v. XTO Energy, Inc.*, No. 4:13-cv-00608, 2014 WL 4202536, at *4 (E.D. Ark. Aug. 22, 2014); *Collins v. SEECO, Inc.*, No. 4:11-cv-761, 2012 WL 2309080, at *1 (E.D. Ark. Jun. 18, 2012). Mr. Turner has no separate cause of action here, and his claim for breach of contract remains barred by the statute of limitations.

### D. Violation of the Arkansas Deceptive Trade Practices Act (Ark. Code Ann. § 4-88-101)

A claim under the Arkansas Deceptive Trade Practices Act requires the plaintiff to prove "1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and 2) injury resulting from such act." *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015). Mr. Turner alleges that XTO engaged in misleading conduct by concealing

production from the Viola Formation and replumbing the well to allow for commingling between the casing and tubing zones. However, Mr. Turner has not cited evidence in the record that would allow a reasonable jury to find that XTO's actions were misleading in a material respect. XTO presents the opinions of its geologist and reservoir engineer that the Viola Formation ceased to produce in the early 1980s. Mr. Turner's only rebuttal to those opinions are pressure tests and a spike in gas production in 1999 that he speculates could have resulted from increased Viola Formation gas production that was commingled with Hale Formation gas production. Mr. Turner's speculations do not raise genuine issues of material fact. As a result, Turner's claim fails.

**IV. Conclusion**

IT IS THEREFORE ORDERED that Defendant XTO's motion (Doc. 11) for summary judgment is GRANTED. Plaintiff J.B. Turner's claims are DISMISSED WITH PREJUDICE. Judgement will be entered separately.

IT IS SO ORDERED this 6th day of August, 2019.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE